UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:15-CR-15 |
| | ) | |
| WESLEY DAVID GROSS | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE

The United States opposes Wesley David Gross's (Gross) request for compassionate release. Gross requests a reduction in his sentence due to the COVID-19 pandemic and various ailments from which he claims to suffer. *See generally* Dkt. Nos. 1077, 1081, 1100. Gross is not a suitable candidate for early release. Specifically, his medical conditions do not rise to the level of extraordinary and compelling circumstances, and the factors in 18 U.S.C. § 3553(a) do not support his early release. His request should be denied.

### BACKGROUND

**1. Gross's Criminal Proceedings**

On February 18, 2016, Gross pled guilty to participating in a conspiracy to distribute alpha-PVP (bath salts, or a-PVP) in violation of 21 U.S.C. § 846. Presentence Report (PSR, filed as Dkt. No. 884) ¶ 1; *see* Dkt Nos. 859 (guilty plea transcript), 497 (minute entry), 426 (plea agreement).

As set out in the PSR and the guilty plea transcript (*see* Dkt. No. 859 at 34–36), Gross was a member of an a-PVP distribution (and in fact, importation)

1

conspiracy beginning in at least 2013. In January 2013, Gross cultivated his own source in China from which to obtain "gravel." PSR ¶ 272. Gross ordered approximately 52 kilograms of gravel from China during 2013. *See id.* On one occasion in January 2014, Gross ordered 500 grams of a-PVP from China, some of which he then distributed to a co-conspirator. PSR ¶ 270; *see also id.* ¶¶ 273–74 (detailing other distributions by Gross). On other occasions, Gross would trade pain pills for grams of "bath salts" at the direction of the conspiracy's ringleader, Bob Branch. PSR ¶ 271.

According to the PSR, Gross carried at least two firearms (a Sig P226 and a 9mm) during the course of the conspiracy. PSR ¶ 270.[1] Further, the PSR recounted that, during a traffic stop of Gross's car in August 2014, Gross possessed suboxone and oxycodone pills, and a search of the car (and items within it, including bags claimed by his passenger/indicted co-conspirator Marcy Branch) revealed syringes, oxycodone, smoking pipes, and a 9mm handgun with two magazines and ammunition. PSR ¶ 275. The following month, Gross was found at a residence where bath salts (which Gross admitted were his) and a .38 revolver were present. PSR ¶ 276.

The probation office assigned Gross three 2-point enhancements under the Guidelines for, respectively, possessing a firearm during a drug offense, importing a controlled substance, and acting as a organizer, leader, manager, or supervisor in the

---

[1] Gross originally was indicted on a 60-month mandatory minimum count for violating 18 U.S.C. § 924(c), but that Count 15 was dismissed pursuant to the plea agreement. Dkt. No. 881 at 1; Dkt. No. 426 at 2–3.

conspiracy. The PSR identified prior convictions of Gross for theft, possession of marijuana, and possession of Schedule III controlled substances (the last of which stemmed from the August 2014 traffic stop recounted above). At the time of the PSR, Gross was identified as having Hepatitis C and spinal stenosis, and it recounted Gross's "long history of substance use." PSR ¶¶ 509, 511.

His advisory guideline range *prior* to his sentencing was 135 to 168 months. PSR ¶¶ 482, 484, 485, 487, 517; *see infra* footnote 2 (discussing rulings at sentencing). In October 2016, this Court sentenced Gross to 96 months in prison (after partially sustaining his objections to the PSR),[2] with 5 years of supervised release to follow. Dkt. No. 881. To date, Gross has served slightly less than 50% of his statutory term (assuming continued good behavior) and is expected to be released on November 30, 2023. Dkt. No. 1100-1 at 2. He is currently housed at FCI Ft. Dix. While incarcerated, Gross has received three infractions (for possessing alcohol, smoking in an unauthorized area, and refusing to take a drug/alcohol test), the last of which occurred in September 2019. Dkt. No. 1100-2.

---

[2] Gross objected to each of the three two-point enhancements in the PSR. PSR at p.107. Although the transcript of the sentencing hearing is not on the docket, *see* dkt. no. 1015, the minute order reflects that the Court sustained in part and overruled in part his objections.

According to the probation office, the Statement of Reasons reflects that the Court sustained Gross's objection to paragraph 484 of the PSR, and thus removed the two-point enhancement for possession of a firearms. This two-point reduction would have yielded a revised Guideline range of 108-135 months under the 2015 Guidelines (criminal history of III with offense level 29, rather than 31).

The minute order also reflects that the Court granted a downward departure or variance. *See* dkt. no. 879.

3

According to his *pro se* and counseled submissions, Gross claims to have sent a request for compassionate release to the warden on April 17, 2020. Dkt. No. 1077 at 2; Dkt. No. 1100 at 10. The BOP has confirmed Gross made an April 17, 2020 request, and a response has not yet been given. *See* Ex. 1.

## 2. The BOP's COVID-19 Response

As the Court is aware, the BOP has undertaken a number of measures and precautions to protect inmates and staff from COVID-19, including quarantines, limited contractor and volunteer access, a prohibition on social and legal visits, maximized social distancing within the facilities, and additional cleaning and sanitizing of the prisons.[3] However, notwithstanding those efforts, same facilities have nonetheless faced a serious outbreak, with numerous confirmed cases and multiple deaths. (As discussed below, FCI Ft. Dix is not one of them.)

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. Mem. from

---

[3] *See, e.g.*, https://www.bop.gov/coronavirus/;
https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.;
https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp
www.bop.gov/resources/news/20200313_covid-19.jsp;
https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

4

Attorney General to BOP Dir. (Mar. 26, 2020).[4] That authority includes the ability to place an inmate in home confinement during the last six months or 10 percent of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).

On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this greater discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. Mem. from Attorney General to BOP Dir. (Apr. 3, 2020).[5] He further clarified his directive should be implemented immediately and "should include all at-risk inmates—not only those who were previously eligible for transfer." *Id*.

BOP is devoting all available resources to executing the directive from the Attorney General. As of June 10, 2020, BOP has transferred 4,010 inmates to home confinement, an increase of 141 percent since March 26, 2020. U.S. Bureau of Prisons,

---

[4]    *Available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/aghome.pdf.

[5]    *Available at* https://dojnet.doj.gov/usao/eousa/ole/tables/misc/agcovid2.pdf.

5

*COVID-19 Home Confinement Information.*[6] BOP professionals continue to monitor this situation and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained under judicial orders.

Lastly, Gross's lengthy discussion of COVID in the prison system, Dkt. No. 1100 at 2–9, is largely unhelpful. To the limited extent it focuses on Gross's institution, FCI Ft. Dix, his data appears to be mistaken, incomplete, or unreliable. For instance, Gross—generally citing the BOP website, Dkt. No. 1100 at 3 n.9—states that 49 inmates at Ft. Dix have contracted COVID, but it seems the number actually is 42 inmate cases (19 active and 23 recovered), with no active staff cases, 5 recovered staff cases, and no inmate or staff deaths. Ex. 2 (Screenshot of BOP stats on June 10, 2020). The total inmate population at FCI Ft. Dix is 2,626, Ex. 3 (Screenshot of FCI Ft. Dix website on June 10, 2020), meaning only 1.5% of the inmate population are or have been positive—a single percentage point difference from the American public at large, according to Gross's own chart. This low rate of infection and relative success at Ft. Dix shows that Gross's focus on other BOP facilities is a red herring.

As for the remainder of Gross's discussion of Ft. Dix, Dkt. No. 1100 at 3–5 nn.10–12, 14, it is cribbed directly from the ACLU's website announcing its class-action habeas lawsuit against the warden. Suffice it to say, a press release of lawyers representing an adverse party in active litigation is not evidence.

---

[6] *Available at* https://www.bop.gov/coronavirus/ (last visited May 20, 2020).

**ARGUMENT**

The Court may not grant a compassionate release motion unless "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Here, Gross claims he submitted a compassionate release request to the warden on April 17th, and the BOP has produced a copy of that request, although no action has been taken on it. Ex. 1. Accordingly, Gross has exhausted his remedies and this Court has jurisdiction. On the merits, it should rebuff Gross's motion.

**1.   Gross Has Not Shown Extraordinary and Compelling Circumstances, and the § 3553 Factors Weigh Against a Sentencing Reduction.**

Section 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides, in part, that the "court may not modify a term of imprisonment once it has been imposed except that . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

For its part, the Sentencing Commission explained that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" *and* "the reduction is

7

consistent with [the] policy statement." U.S.S.G. § 1B1.13. In addition, the Commission further explained that certain serious medical conditions—including terminal conditions or conditions that diminish the ability of the inmate to provide self-care—may qualify as "extraordinary and compelling" conditions that would justify release. *See id.* at App. Note. 1.

### A. Gross's medical conditions, which appear well-controlled, resolved, or suspect, do not present extraordinary and compelling circumstances.

Tellingly, Gross only generically refers to his "history of asthma, COPD, [and] hepatitis C." Dkt. No. 1100 at 1; *see id.* at 10. While certain iterations of these conditions (which would generally not qualify as extraordinary or compelling circumstances in normal times) are recognized by the CDC as potentially placing individuals at a higher risk of severe outcomes from COVID-19,[7] actual scrutiny of Gross's medical records reveal that his particular medical conditions and history do not rise to the level of extraordinary and compelling.

<u>Asthma</u>. According to the CDC, asthma is an exacerbating risk factor only if it is "moderate-to-severe." Gross's records, however, indicate he has mild asthma that appears to be well controlled. In December 2019, in response to asthma present with seasonal allergies, he was prescribed an albuterol inhaler with orders of "don't use daily" and only on an as-needed basis.

---

[7] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited June 10, 2020).

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| 452682-FTD | Albuterol Inhaler HFA (8.5 GM) 90 MCG/ACT | 12/03/2019 09:49 | Don't use daily. Inhale 2 puffs by mouth 4 times a day as needed to prevent/relieve asthma attack (inhaler to last 90 days. If need more, make sick call) x 365 day(s) |

Dkt. 1103 at 7. This is consistent with Gross's prior and subsequent course of treatment. *E.g.*, *id*. at 33, 36 (noting same prescription on various dates with same directions). Nothing in Gross's record, in other words, indicates he has moderate or severe asthma that requires anything more than occasional inhaler use.

COPD. As of late November 2019, Gross had no documented history of "COPD."

| Encounter Date: 11/26/2019 10:45 | |
|---|---|
| Hx of COPD: | No |

Dkt. No. 1103 at 12. This was consistent with his PSR (¶ 509), and his sworn statements at his guilty plea hearing, Dkt. No. 859 at 12–18, neither of which identified COPD or any lung disease.

Suddenly, on March 31, 2020—weeks *after* the COVID-19 pandemic was well-known in the United States and inmates across the country began seeking release; and only days *before* Gross began submitting release requests to the warden, Dkt. No. 1077 at 2—Gross apparently reported during a "dental health history screen" that he had a history ("Hx") of COPD.

| Encounter Date: 03/31/2020 08:45 | |
|---|---|
| Hx of COPD: | Yes |

9

Dkt. No. 1103 at 34–35. Under these circumstances and on this record, Gross has not carried his burden to show he suffers from COPD. The circumstances instead create the inference that Gross's COPD is not genuine and claimed in order to aid an effort to obtain early release.

<u>Hepatitis C</u>. Finally, although Gross has a history of Hepatitis C ("Hep C"), his patient file seems to indicate he received and completed Hep C treatment in 2019 with the anti-viral drug harvoni ("s/p"—i.e., status post, or after) and has had a low viral load ("VL") that does not necessitate further treatment with harvoni. This condition, if it remains at all, thus appears to be well-controlled.[8]

> Encounter Date: 12/03/2019 09:49
>
> HepC-pt is s/p harvoni. VL in 5/2019 <15

Dkt. No. 1103 at 5.

> Encounter Date: 07/29/2019 10:08
>
> **Chief Complaint:** INFECTIOUS DISEASE
> **Subjective:** Hx of Hep C and completion of treatment performed 2/19. Pt arrives to review VL results.
>
> **Exam Comments**
>   lab 5/19: Hep C CL: < 15
> **ASSESSMENT:**
>   Chronic viral hepatitis C, B182 - Resolved

---

[8] Paradoxically, in addressing hepatitis and COVID-19, the CDC's website says it has "no information" about whether those with hepatitis B or C are at increased risked for getting or having severe COVID-19, only to then generically state that those with a "serious underlying medical conditions" such as liver disease "might" be a higher risk for severe illness, "particularly if" the condition is "not well controlled." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last visited June 10, 2020).

Dkt. No. 1103 at 10.

```
COLLECTED:  05/30/2019    06:30
RECEIVED:   05/31/2019    19:12
REPORTED:   06/01/2019    18:30
```

| Test Name | In Range | Out of Range | Reference Range |
|---|---|---|---|
| HCV RNA Quan Progressive to Genotyping | | | |
|   HEPATITIS C, RNA, QUANTITATIVE, PCR | | | |
|     HCV RNA, PCR, QN | <15 HCV RNA Not Detected | | IU/mL |
|     HCV RNA, PCR, QN | <1.18 HCV RNA Not Detected | | log IU/mL |

Reference Range:
    Not Detected    IU/mL
    Not Detected    Log IU/mL

This test was performed using Real-Time Polymerase Chain Reaction.

Reportable range is 15 IU/mL to 100,000,000 IU/mL (1.18 Log IU/mL to 8.00 Log IU/mL).

*Id.* at 50. As of a March 31, 2020 follow-up dental screen, BOP providers continued to note follow-up labs to monitor Gross.

**Encounter Date: 03/31/2020 08:45**

Chronic viral hepatitis C            Resolved
Recheck labs; is probably not a candidate for Harvoni therapy at this time based on APR.

Id. at 34. Finally, Gross also received immunizations for Hepatitis A and B in December 2019. *Id.* at 31.[9]

\* \* \*

In sum, Gross's medical records do not show extraordinary and compelling circumstances that would justify consideration of his early release.

---

[9] Gross does not argue that his spinal stenosis counts as an extraordinary and compelling condition, and the Government would dispute the point if he did.

11

### B. The § 3553 factors do not warrant release.

Yet even if Gross's medical history constituted extraordinary and compelling circumstances, that alone is not enough. The Court must also consider whether Gross is a danger to the community, along with the factors set forth in 18 U.S.C. § 3553(a), *see* 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13; and those considerations favor Gross's continued incarceration.

For example, looking at the circumstances of the crime under § 3553(a)(1), Gross imported from China, bought, and/or sold dozens of kilograms of alpha-PVP while participating in a broad drug conspiracy between 2013 and 2014. *See* PSR ¶¶ 269–76. Nor was Gross limited to one type of drug. The PSR reflects that he traded "pain pills" for a-PVP, and that he carried Schedule II and Schedule III controlled substances with him during the conspiracy. Finally, it is well established that drugs and guns are both a dangerous mix and often go together. Although the Court apparently did not give Gross an enhancement for possessing a gun, *see supra* footnote 2, the PSR certainly reflects that Gross was in close proximity to firearms during the course of his drug activity, and that guns were used by others during it. Gross (as well as several co-conspirators) were charged with § 924(c) violations for carrying firearms during drug crimes, and several of them (Robert Branch, John Bryan, Samuel Courtney, Daniel Greear, Joshua Hughes, and Brandon Whited) were found guilty of that charge.

Gross's conduct—with a far reaching impact on and danger to the community—warrants serious sanctions, even during a pandemic, and allowing Gross to serve only

12

half of his original sentence would simply not be sufficient. *See* 18 U.S.C. § 3553(a)(2) (explaining that the sentence needs "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"). And house arrest, however difficult it has seemed during these extraordinary times, is not consonant with the seriousness of Gross's crime and his conduct, or the sentences faced by others who participated in large-scale drug conspiracies. *See* 18 U.S.C. § 3553(a)(6) (sentence must reflect "the need to avoid unwarranted sentence disparities").

Gross casts himself as a mere "non-violent drug offen[der]," Dkt. No. 1100 at 11, but that undersells the harm his drug of choice inflicted on the community, and his capacity to re-inflect harm should he resume that lifestyle (a relapse risk that is also heightened given his long history of drug abuse and prior drug possession convictions). So although Gross was not convicted of a violent act, his conduct nevertheless shows that he poses a danger to the community if released, and that his continued incarceration is necessary "protect the public[.]" § 3553(a)(2)(C).

At bottom, these considerations outweigh the concerns raised by the COVID-19 pandemic. His offense conduct was serious, and the underlying facts indicate he's dangerous. Accordingly, Gross's motion for release should be denied.[10]

**CONCLUSION**

For all of the foregoing reasons, the United States respectfully requests that

---

[10] In the event that the Court determines that Gross should be released, the government requests his release be preceded by a 14-day quarantine to minimize any risk to the public.

13

the Court deny Gross's motion for compassionate release.

Respectfully submitted,

THOMAS T. CULLEN
United States Attorney

/s/ S. Cagle Juhan,
Assistant U.S. Attorney
District of Columbia Bar No. 1022935
United States Attorney's Office
255 West Main Street, Room 130
Charlottesville, Virginia 22902
434-293-4283 / cagle.juhan@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record.

s/ S. Cagle Juhan
Assistant United States Attorney
